395 So.2d 840 (1981)
Henry W. THOMPSON, Jr.
v.
GREAT MIDWEST FUR COMPANY et al.
No. 13887.
Court of Appeal of Louisiana, First Circuit.
January 26, 1981.
*841 John Burgess, Livingston, for plaintiff.
Haydn Berey, Livingston, A. Wayne Stewart, Denham Springs, for defendant.
Before ELLIS, COLE and WATKINS, JJ.
COLE, Judge.
This is a suit for specific performance of a contract of sale. Defendants Great Midwest Fur Company and Larry Carroll appeal a judgment rendered against them in solido in the amount of $11,940.00 plus legal interest. The issues presented are whether or not the defendants are subject to the personal jurisdiction of the Louisiana courts and whether or not the plaintiff proved the relationship of principal and agent existed between Great Midwest and Larry Carroll.
Because the facts of the case are so crucial to our review it is necessary to present them in some detail. In March 1978, defendant Larry Carroll attended a fur auction in or near Livingston Parish, Louisiana. Shortly thereafter, on March 8, 1978, Carroll met with a local fur buyer, plaintiff *842 Henry Thompson. Carroll introduced himself as a buyer and a grader for the Great Midwest Fur Company of Kirkland, Illinois. He presented a business card bearing Great Midwest's name and telephone number. The president of the company's name was printed on the card and Carroll's name had been added in his own handwriting.
Carroll and Thompson negotiated a deal at Thompson's house. Carroll informed Thompson Great Midwest was interested in buying up to 10,000 raccoon furs from the area. The men agreed Thompson would initially provide Carroll with 2,000 furs. Carroll was familiar with the fur in the area because he had graded fur at the recent auction. The men agreed on a price and Thompson sold Carroll several samples to show to his boss, David Smith, President of Great Midwest. They agreed Thompson was to proceed to buy the furs from the local trappers.
Several days later Thompson phoned Great Midwest and spoke to Carroll and David Smith. Thompson informed the men he had obtained 1700 raccoon skins and 20 opossum skins. The original price for the skins was reaffirmed in the phone conversation. David Smith instructed Thompson to take the furs to West Memphis, Arkansas where he was to meet Larry Carroll. The men met in Arkansas on March 12, 1978. Carroll inspected and counted the furs and after several phone calls to David Smith, wrote a check to Henry Thompson for $11,940.00. The check was written on the account of "Larry Carroll, Buyer for Great Midwest Fur Co."
On March 14, 1978, Larry Carroll returned to Louisiana to negotiate further with Thompson for additional raccoon skins. Carroll informed Thompson he had ordered a stop payment of the $11,940 check. Thompson went to Livingston State Bank at Albany where banker, Glen Stevens, called the drawee bank in Illinois and confirmed a stop payment order had been issued. Larry Carroll did not testify at trial but information solicited from David Smith revealed Smith had promised to pay Carroll a certain price for the furs if they were of the quality described by Carroll. When Smith examined the furs he found the quality to be poor and informed Carroll he would pay him only $6,200 for the skins. Carroll then ordered payment be stopped on the check he had written to Thompson.
The record shows Carroll and Thompson then met with Thompson's attorney to attempt to remedy the situation. They placed a conference phone call to David Smith and to Mr. Burley Marler, a fur expert. Smith informed Thompson the furs had already been scraped and sold to a man in New York but that he would gladly arrange for the furs to be shipped back to Thompson. Marlar advised Thompson not to accept the furs because they had been altered by the scraping and it would be impossible for Thompson to identify the furs as his own. Thompson therefore refused to accept the furs and subsequently filed suit for specific performance.
The first issue raised by appellants is whether or not they are subject to the personal jurisdiction of the Louisiana courts. Appellants argue the sale was finalized in Arkansas therefore Louisiana has no jurisdiction. This argument reflects a misunderstanding of the concept of in personam jurisdiction. Personal jurisdiction is based upon sufficient minimal contacts within a state. When a person has had sufficient dealings in a state it is considered fair to require that person to appear in the state's courts. International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); Standard Fittings Co. v. SAPAG, S. A., 625 F.2d 630 (5th Cir. 1980).
Louisiana's "long arm" statute, La.R.S. 13:3201, sets forth several circumstances which our legislature has deemed sufficient for this state to assert personal jurisdiction over a nonresident. The statute reads in part as follows:
"A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from the nonresident's *843 (a) transacting any business in this state;"
The comments of the Louisiana State Law Institute immediately following the text of the statute indicate the term "transacting business" is to be given a broad interpretation. The comments state, "It is intended to mean a single transaction of either interstate or intrastate business, and to be as broad as the phrase `engaged in a business activity' of R.S. 13:3471(1)."[1]
The question of applicability of the long arm statute is an issue of fact, the determination of which must rest upon the peculiar circumstance of each individual case. Aucoin v. Hanson, 207 So.2d 834 (La. App. 3d Cir. 1968). The facts of this case disclose Larry Carroll had sufficient minimal contacts and indeed had "transacted business" within the state of Louisiana so as to justify Louisiana's exercise of personal jurisdiction. The contract seemed to be one with a suspensive condition, i. e., the right of view and trial, so that it was finalized when Carroll inspected the furs in Arkansas. Civil Code art. 2460. The fact that the contract was completed in Arkansas is immaterial because the record amply supports the conclusion that Mr. Carroll had transacted business in Louisiana prior to the finalization of the deal.
A careful examination of the record shows Carroll had several contacts in the state of Louisiana which culminated in the sale of the raccoon furs. He traveled to Louisiana for the purpose of buying raccoon skins for Great Midwest. He met Mr. Thompson in this state and negotiated the entire deal at Mr. Thompson's house in Livingston Parish. Testimony by several witnesses at trial showed Mr. Carroll introduced himself to many local people in the fur industry and handed each of them his business card. He obviously was attempting to make contacts with fur dealers in the area for future business purposes.
Mr. Carroll attended the fur auction in Louisiana and graded furs there. Virtually every preliminary matter concerning the sale of the 1700 raccoon skins was discussed and settled in Louisiana. Although no money changed hands in this state, in order to give the term "transacting business" the broad meaning the legislature intended it to have, we must conclude Mr. Carroll's negotiations amounted to transacting business in this state. If we were to require the contract be actually consummated in this state we would be allowing nonresidents to come to Louisiana and negotiate a business deal for weeks, months or years, yet so long as the final act was performed out of state, these persons would be free of the jurisdiction of our courts. Obviously this would be an undesirable result.
The purpose of the long arm statute is to extend personal jurisdiction of Louisiana courts over nonresidents to the full limits of due process, i. e., to any nonresident who has had "minimal contacts" in the state. The section must be liberally interpreted in favor of finding jurisdiction. Mayeux v. Hughes, 333 So.2d 273 (La.App. 1st Cir. 1976); Latham v. Ryan, 373 So.2d 242 (La.App. 3d Cir. 1979).
The facts of this case also disclose the activities of Great Midwest, both directly and through an apparent agency relationship, as hereafter discussed, were sufficient to bring it within the boundaries of Louisiana's long arm statute and the principles of due process, and thus subject it to the jurisdiction of Louisiana courts. Standard Fittings Co. v. SAPAG, S. A., supra.
The second issue raised on appeal is whether or not plaintiff established the existence of an agency relationship between Larry Carroll and Great Midwest. We note at the outset the distinction between actual and apparent authority of an agent. Actual authority exists when the principal grants authority to the agent either by express or implied consent. Apparent authority arises when the principal acts in such a way that third persons are justified in assuming the agent has certain authority, even though the principal may not have granted the authority to the agent. The *844 principal is then estopped to deny the existence of an agency relationship. 2A C.J.S. Agency § 146. Apparent authority is defined as follows:
"The expression `apparent authority,' as well as its variant, `ostensible authority,' has been defined as connoting that authority which a principal holds his agent out as possessing or permits him to exercise or to represent himself as possessing, under such circumstances as to estop the principal from denying its existence." 2A CJS Agency § 157.
Apparent authority is not mentioned in our Civil Code but has been jurisprudentially recognized as agency by estoppel. It arises when the principal, by his acts or conduct, has knowingly caused or permitted another to appear as his agent to the injury of third parties who have acted in good faith and with reasonable prudence. Alphonse Brenner Company Inc. v. Dickerson, 283 So.2d 849 (La.App. 2d Cir. 1973). The principal will be bound for the agent's actions if the principal has acted in a manner so as to give an innocent third party the reasonable belief the agent has authority to act for the principal. AAA Tire & Export, Inc. v. Big Chief Truck, 385 So.2d 426 (La. App. 1st Cir. 1980).
We note initially it is not the actions taken by the alleged agent himself that create apparent authority. It is undisputed Mr. Carroll introduced himself as a buyer for Great Midwest, handed out Great Midwest business cards, and had his personal checks printed "Larry Carroll, Buyer for Great Midwest Fur Co." Certainly these facts are important in that they justify Mr. Thompson's belief that Carroll was an agent for Midwest. These indicia of an agency relationship make it entirely reasonable for Thompson to assume he was dealing not with Larry Carroll as an individual, but with Larry Carroll as an agent for a large fur company.
But these facts alone cannot create the appearance of an agency relationship. We must focus attention on the actions of the principal, through its president, David Smith, to determine if it should be estopped from denying the agency relationship between it and Carroll. We need not decide whether or not Carroll had the actual authority to act for Great Midwest because we find ample evidence in the record showing Smith acted to create the appearance of an agency and Great Midwest should therefore be estopped.
Testimony at trial showed Smith allowed Carroll to use the Great Midwest telephone as his business phone. Thompson testified he reached Carroll at Great Midwest on several occasions. Another local fur dealer, Charles Kraft, testified he too had called and talked to Carroll at the Great Midwest's office. David Smith testified he allowed Carroll to use his telephone because Carroll did not have one of his own. Smith stated he and his secretaries took messages for Carroll. The fact Carroll could be reached at almost any time at Great Midwest certainly creates the appearance of a connexity between Carroll and Great Midwest.
David Smith testified Larry Carroll was a completely independent fur buyer who had no connection whatsoever to Great Midwest. Henry Thompson testified he had several phone conversations with Mr. Smith concerning the sale and Mr. Smith referred to Carroll as his buyer and his grader. Thompson stated Mr. Smith made the arrangements for Thompson to meet Carroll in West Memphis, Arkansas. When Thompson arrived in West Memphis he was unable to locate Carroll so he called Smith in Illinois. Smith promptly provided Thompson with Carroll's room number at a local motel. Indeed, Mr. Smith was closely involved in the sale and one may reasonably ask why, if Mr. Carroll was simply an independent buyer with no connexity to Great Midwest.
When Thompson and Carroll met in Arkansas, Carroll counted and inspected the furs. He made several phone calls to Mr. Smith before completing the contract by writing the check to Thompson. Certainly this situation, of Carroll checking with Smith before finalizing the deal, created the impression Smith had the final word about *845 the sale. The facts do not support Mr. Smith's contention that he had no authority over Larry Carroll.
Further evidence of the appearance of an agency relationship is found in an incident which occurred after the stop payment order was issued. The record indicates after Thompson became aware of his dilemma concerning the check, Mr. Carroll may have been detained for a short while at the Livingston Parish Sheriff's office.[2] Carroll telephoned Smith for help. Smith contacted the F.B.I. on Carroll's behalf. He attempted to buy a tape recorder so he could follow the suggestion of the F.B.I. and obtain a statement from all parties involved. Smith had earlier offered to pay to have the skins shipped from New York to Louisiana in order to resolve the dispute. This intense concern and quick defense on Smith's part certainly added to the appearance of an agency relationship between Great Midwest, acting through Smith, and Carroll.
Mr. Smith testified at trial Carroll's trip to Louisiana was for the purpose of filling the order of one of Great Midwest's brokers who was seeking a certain grade of raccoon skin. Carroll felt he could fill this order with skins from Louisiana. Therefore it cannot be said Carroll was simply buying skins on a speculative basis with hopes to sell them to some fur company. He was on a mission specifically for Great Midwest.
The plaintiff had issued a subpoena duces tecum directing David Smith to produce all cancelled check stubs from the accounts of Great Midwest and from his personal account. The subpoena requested these items dating from January 1977 to February 1980. Mr. Smith failed to produce any of his personal checks but did comply by providing some of the checks written on Great Midwest's accounts. The checks which would have been written in the period of February 8, 1978 to April 6, 1978 (the period surrounding the fur sale which is the subject of this litigation) were conspicuously absent. The other checks revealed Great Midwest had paid Larry Carroll approximately $17,000 during the three year period. The checks were marked as to their purpose such as advance on furs, payment on furs, and supplies. This evidence is significant in that it reveals the regularity with which Great Midwest dealt with Larry Carroll. Even more significant is the fact that all checks written around March 1978, which would have reflected the existence of or lack of any contributions to the business venture to Louisiana, were not produced.
A third party is entitled to rely on the apparent authority of an agent until something occurs that would cause a reasonable man to inquire further into the circumstances. Radiofone v. Oxford Bldg. Services, etc., 347 So.2d 327 (La.App. 4th Cir. 1977). We find nothing in the foregoing facts that would indicate to Mr. Thompson that Carroll was not an agent for Great Midwest. Throughout the entire incident of the sale, Mr. Smith talked to Mr. Thompson and implied Mr. Carroll was acting on behalf of Great Midwest. There was ample opportunity for Smith to have denied any relationship or to have clearly explained the nature of the relationship. But because Smith continued to act as though he was in a supervisory position in relation to the sale, Thompson was justified in relying on the appearance of the agency relationship.
David Smith insisted at trial Larry Carroll was not his agent but was a completely independent buyer. He stated that when called about Carroll's stop payment order he informed Mr. Thompson's attorney he did not care what happened to Larry Carroll. He stated he informed Mr. Thompson in his initial phone call he could not deal directly with Mr. Thompson because Mr. Carroll had already initiated the dealings. He stated he freely handed out his business cards to his independent buyers for their own reference and that he was unaware Mr. Carroll used Great Midwest's name on his personal checking account. He testified he had subsequently filed suit against Mr. Carroll for using the company's name.
*846 There is conflicting testimony as to the nature of the relationship between Mr. Smith and Mr. Carroll and as to Mr. Smith's actions which allegedly created the appearance of an agency relationship. We find as a whole the evidence supports plaintiff's argument that Mr. Smith acted in a way so as to create the appearance of an agency relationship, therefore he should be estopped to deny the agency. As always, when two adverse parties give directly contradictory versions of facts, the trial court's assessment of the credibility is given great weight. Givens v. Held, 371 So.2d 1189 (La.App. 1st Cir. 1979), writ refused 1979. The finding of the trial court will not be disturbed on appeal unless there is manifest error. Scott v. Kosbab, 368 So.2d 191 (La. App. 1st Cir. 1979); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), rehearing denied 1979. We find no manifest error was committed, therefore we affirm the judgment of the trial court. Appellants are to pay all costs of these proceedings.
AFFIRMED.
NOTES
[1] La.R.S. 13:3471 deals with supplementary rules of service of process.
[2] The record shows Carroll filed a reconventional demand against Thompson in connection with this incident but the demand was dismissed.